# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Karl Ebert, Carol Krauze, and                           Civil No. 13-3341 (DWF/JJK)
Jackie Milbrandt, individually and
on behalf of others similarly situated,

Plaintiffs,

v.                                                                   **MEMORANDUM**
                                                                     **OPINION AND ORDER**
General Mills, Inc.,

Defendant.

---

Edward J. Manzke, Esq., and Shawn M. Collins., Esq., The Collins Law Firm PC;
Michael D. Hayes, Esq., and Norman B. Berger, Esq., Varga Berger Ledsky Hayes &
Casey; and Anne T. Regan, Esq., and J. Gordon Rudd, Jr., Esq., Zimmerman Reed,
PLLP; and Mark H. Thieroff, Esq., Siegel Brill, P.A., counsel for Plaintiffs.

Benjamin W. Hulse, Esq., Corey Lee Gordon, Esq., Emily A. Ambrose, Esq., Jerry W.
Blackwell, Esq., and Wendy M. Carlisle, Esq., Blackwell Burke PA; and Jeffrey Fowler,
Esq., O'Melveny & Myers LLP; and Mark J. Carpenter, Esq., Carpenter Law Firm
PLLC, counsel for Defendant.

---

## INTRODUCTION

This matter is before the Court on Defendant General Mills, Inc.'s ("GMI" or

"Defendant") Motion to Dismiss the Second Amended Complaint ("SAC"). (Doc.

No. 97.) For the reasons set forth below, the Court denies the motion.

## BACKGROUND

Plaintiffs Karl Ebert ("Ebert"), Carol Krauze ("Krauze"), and Jackie Milbrandt

("Milbrandt"), individually and on behalf of others similarly situated (collectively,

"Plaintiffs"), allege that GMI owned and operated an industrial facility (the "GMI

Facility") in the Como neighborhood of Minneapolis from 1930 to 1977.  (Doc. No. 87,

"SAC" ¶¶ 2, 6.)  From 1947 to 1962, GMI disposed of thousands of gallons of hazardous

substances per year by burying it in perforated drums in the ground at the GMI Facility.

(*Id.* ¶¶ 2, 12-14.)  The hazardous substances included the toxic chemical trichloroethylene

("TCE"), a known human carcinogen.  (*Id.* ¶ 12.)  Plaintiffs allege that TCE and other

chemicals in the form of toxic vapors have migrated "beneath, inside or immediately

adjacent to" the surrounding area (the "Area" or the "GMI Site"), including all of the

homes in the Class area, and that the Area has been contaminated by the vapors as a

result.  (*Id.* ¶¶ 2, 12, 15.)

According to GMI, the GMI Facility was listed on the United States

Environmental Protection Agency's ("USEPA") National Priorities List in 1984.  (Doc.

No. 99 at 4.)  GMI then entered into a Response Order by Consent ("Consent Order")

with the Minnesota Pollution Control Agency ("MPCA") to fulfill its obligations to

remediate environmental hazards at the GMI Facility.  (Doc. No. 100 ("Hulse Decl.") ¶ 4,

Ex. 1 ("Consent Order"); *see also* Doc. No. 99 at 4.)  The Consent Order includes the

following language:

> This RESPONSE ORDER BY CONSENT (Order) is issued pursuant to the
> authority vested in the Minnesota Pollution Control Agency (MPCA) by the
> Environmental Response and Liability Act of 1983 (ERLA), Minn. Stat.
> Ch. 115B, and Minn. Stat. Chs. 115 and 116.

(*Id.* at 1.)  Since then, GMI has been implementing remedial actions with respect to

groundwater, subject to five-year reviews by the MPCA.  (*See* Hayes Decl. ¶ 5, Ex. 3.)

The MPCA and USEPA entered into other agreements addressing the remedial actions at the GMI Facility, including:  a Superfund Memorandum of Agreement ("SMOA") in 1994 (Doc. No. 110, ("Second Hulse Decl.") ¶ 3, Ex. A ("SMOA")), and an Enforcement Deferral Pilot Project ("Deferral Project") in 1995 (Doc. No. 108, ("Hayes Decl.") ¶ 6, Ex. 4 ("Deferral Project")).  The SMOA "delineate[s] the respective roles and responsibilities of [USEPA, Region V (EPA), and the State of Minnesota by its MPCA] as they relate to the conduct of a Superfund program to clean up hazardous waste sites in the State."  (SMOA at 1.)  The Deferral Project related to thirteen sites, and deferred authority over all remedial actions to the MPCA, which had "full responsibility" to administer, "investigate and clean up" the sites in the program "through its authority under MERLA."  (Deferral Project at 50-51.)  The GMI Facility was on the original Deferral Pilot Project list and remains on the list today.  (Hayes Decl. ¶ 5, Ex. 3.)

In 2014, the MPCA and GMI modified the Consent Order (the "2014 Modification") to require:

> [GMI] to conduct vapor sampling beneath buildings in the vicinity of its former facility, install mitigation systems in qualifying homes, conduct a comprehensive vapor intrusion investigation . . . and identify and evaluate the feasibility of potential remedial technologies to address soil, soil gas and groundwater as necessary to adequately protect human health and the environment.

(Hulse Decl. ¶ 5, Ex. 2 ("2014 Modification").)

Ebert, Krauze, and Milbrandt own residential property in the Area.  (SAC ¶¶ 7-8.) Plaintiffs brought this suit individually and on behalf of all others similarly situated.  (*See id.* ¶¶ 1-8.)  Plaintiffs allegedly first learned of the TCE vapor contamination in and

around their homes in 2013.  (*Id.* ¶ 15.)  Plaintiffs allege that the vapors threaten the

health of residents in the Area, have negatively impacted the value of homes in the Area,

and have affected the Area residents' reasonable use and enjoyment of their properties.

(*Id.* ¶¶ 2-3, 15-16, 38, 42.)  Plaintiffs also allege that upon learning of the TCE vapor

contamination, Ebert and Krauze incurred out-of-pocket costs to gauge the threat of any

released vapors inside of their home and to assess any structural issues related to interim

remedial measures.  (*Id.* ¶ 32.)  Milbrandt alleges she incurred out-of-pocket expenses to

install an air filtration system and mitigate any health threats posed by the TCE vapors.

(*Id.*)

Plaintiffs further allege that GMI has failed to adequately investigate and

remediate the contamination, and, as a result, the vapors continue to migrate into the

Area.  (*Id.* ¶¶ 4-5, 15, 17, 34, 36, 38-39, 41-42, 45-46.)  GMI is installing vapor

mitigation systems ("VMS") at Ebert's and Krauze's homes to address any threat posed

by TCE vapor contamination and as required in the 2014 Modification.  (*Id.* ¶ 7;

*see*  2014 Modification.)  However, Plaintiffs allege that VMS systems are only remedial

measures and will not substantially remediate the relevant properties.  (SAC ¶ 7.)

Plaintiffs seek damages and injunctive relief for the alleged past and present

contamination of the entire Area by the continued migration of TCE released from the

GMI Facility, as well as Defendant's alleged failure to properly remediate the

contamination.  (*Id.* ¶¶ 1-5.)  In the SAC, Plaintiffs assert the following claims:

(1) "response costs" under the Comprehensive Environmental Response, Compensation,

and Liability Act ("CERCLA"), 42 U.S.C. § 9607(a); (2) negligence; (3) private

nuisance; (4) willful and wanton misconduct; and (5) violation of the Resources

Conservation and Recovery Act ("RCRA"), § 6972(a)(1)(b).  (*Id.* ¶¶ 26-61.)  Defendant

now moves to dismiss Plaintiffs' claims in their entirety.  (Doc. No. 97.)

## DISCUSSION

### I.     Legal Standard

#### A.     Rule 12(b)(1)

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) challenges the

Court's subject matter jurisdiction.  To survive a motion to dismiss for lack of subject

matter jurisdiction, the party asserting jurisdiction has the burden of proving jurisdiction.

*VS Ltd. P'ship v. Dep't of Hous. & Urban Dev.*, 235 F.3d 1109, 1112 (8th Cir. 2000)

(citation omitted).  "Subject matter jurisdiction is a threshold requirement which must be

assured in every federal case."  *Kronholm v. Fed. Deposit Ins. Corp.*, 915 F.2d 1171,

1174 (8th Cir. 1990).

A motion to dismiss for lack of subject matter jurisdiction may challenge a

plaintiff's complaint either on its face or on the factual truthfulness of its averments.

*Osborn v. United States*, 918 F.2d 724, 729 n.6 (8th Cir.1990) (citations omitted).  When

a defendant brings a facial challenge—a challenge that, even if truthful, the facts alleged

in a claim are insufficient to establish jurisdiction—a court reviews the pleadings alone,

and the non-moving party receives the same protections as it would defending against a

motion brought pursuant to Rule 12(b)(6).  *Id.* (citation omitted).  In a factual challenge

to jurisdiction, the court may consider matters outside the pleadings, and the non-moving

party does not benefit from the safeguards of Rule 12(b)(6).  *Id.* at 729-30, n.4 (citations

omitted) (holding that on a Rule 12(b)(1) motion challenging subject-matter jurisdiction, the court "has authority to consider matters outside the pleadings").

### B.     Rule 12(b)(6)

In deciding a motion to dismiss pursuant to Rule 12(b)(6), a court assumes all facts in the complaint to be true and construes all reasonable inferences from those facts in the light most favorable to the complainant. *Morton v. Becker*, 793 F.2d 185, 187 (8th Cir. 1986). In doing so, however, a court need not accept as true wholly conclusory allegations, *Hanten v. Sch. Dist. of Riverview Gardens*, 183 F.3d 799, 805 (8th Cir. 1999), or legal conclusions drawn by the pleader from the facts alleged. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990). A court may consider the complaint, matters of public record, orders, materials embraced by the complaint, and exhibits attached to the complaint in deciding a motion to dismiss under Rule 12(b)(6). *Porous*, 186 F.3d at 1079.

To survive a motion to dismiss, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). Although a complaint need not contain "detailed factual allegations," it must contain facts with enough specificity "to raise a right to relief above the speculative level." *Id*. at 555. As the United States Supreme Court reiterated, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," will not pass muster under *Twombly*. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555). In sum, this standard "calls for enough fact[s] to raise a

6

reasonable expectation that discovery will reveal evidence of [the claim]." *Twombly*, 550

U.S. at 556.

## II.    Injunctive Relief

### A.    Article III Standing

GMI seeks dismissal of Plaintiffs' claims seeking injunctive relief[1] pursuant to

Rule 12(b)(1) on the grounds that Plaintiffs lack Article III standing for failure to

establish redressability.

To establish standing under Article III of the Constitution, a plaintiff must have a

"justiciable case or controversy," which requires:  (1) injury in fact; (2) a causal

connection between the injury and the conduct at issue; and (3) likelihood that the

remedy the plaintiff seeks will redress the alleged injury.  *See Steel Co. v. Citizens for a*

*Better Env't,* 523 U.S. 83 (1998) (quotations and citation omitted); *Iowa League of Cities*

*v. E.P.A.*, 711 F.3d 844, 869 (8th Cir. 2013).

A plaintiff seeking injunctive relief must show that he "faces a threat of future or

ongoing harm."  *Park v. Forest Serv. of the United States*, 205 F.3d 1034, 1037 (8th

Cir. 2000).  An injury resulting from past "illegal conduct" alone is not enough to support

a claim for injunctive relief.  *Id.*  Likewise, a plaintiff's speculation that a future injury

---

[1]     Plaintiffs seek injunctive relief for their common law claims in Counts II, III, and IV, and for their RCRA claim (Count V).  Specifically, Plaintiffs seek to "restrain[] and enjoin[] GMI" from allowing the continuing migration of TCE and contamination of the Plaintiffs' properties and of the environment.  (SAC ¶¶ D-E.)  Plaintiffs also seek "to compel GMI to comprehensively remediate" TCE contamination on Plaintiffs' property, on the Area properties, and at the GMI Facility.  (*Id.*)  Under the RCRA claim, Plaintiffs seek remediation of the contamination of the environment and "all impacted groundwater aquifers."  (*Id.* ¶ E.)

may occur is not sufficient to warrant injunctive relief.  *Los Angeles v. Lyons*, 461 U.S.

95, 111 (1983).  A plaintiff must show that the threat of injury is "real and immediate."

*O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).  In so doing, a plaintiff can show that

injunctive relief "will remedy the alleged harm."  *Steel Co.*, 523 U.S. at 108.

Here, GMI only disputes the third prong of the standing test—the likelihood that

the remedy sought will redress the alleged injury.  Specifically, GMI argues that

Plaintiffs lack standing for injunctive relief because GMI has already agreed to mitigate

the threat of injury from the migration of TCE vapors through the installation of VMS,[2]

and that Plaintiffs cannot show that "comprehensive remediation" will redress their

alleged injuries in a meaningful way.  (Doc. No. 99 at 10.)

Plaintiffs, however, allege that installation of VMS is insufficient to

comprehensively redress the injury or imminent threat of injury posed to Plaintiffs by the

vapor migration.  (SAC ¶¶ 2, 4-5, 7, 12, 15; *see also* Doc. No. 107 at 4, 17-18.)

Plaintiffs also allege that additional action is necessary to fully remediate the

contamination of the Area by acting at the source of the contamination—the GMI

Facility.  (*See* SAC ¶¶ 2, 4-5, 7, 12, 15.)

The Court agrees with Plaintiffs that the relief sought is sufficient to establish

standing under Article III.  Plaintiffs seek remediation at the source of the TCE

contamination and complete elimination of the contamination of their property.  (*Id.*

¶¶ 4-5.)  Plaintiffs assert that there is a continuing threat of migration of a known human

---

[2]     It is undisputed that Defendant has agreed to install VMS as recommended by the USEPA into Ebert's and Krauze's homes.  (Doc. No. 99 at 12-13; Doc. No. 87 ¶ 7.)

carcinogen from the contaminated GMI Facility that is ongoing, "real and immediate."
(*Id.*)  *See O'Shea*, 414 U.S. at 496; *see also Park*, 205 F.3d at 1037.  These factual

allegations are sufficient for Plaintiffs to meet their burden of establishing jurisdiction

under Rule 12(b)(1) at this stage in the proceedings.  *See Lujan v. Defenders of Wildlife*,

504 U.S. 555, 561 (1992) (citation omitted) ("At the pleading stage, general factual

allegations of injury resulting from the defendant's conduct may suffice, for on a motion

to dismiss we 'presum[e] that general allegations embrace those specific facts that are

necessary to support the claim.'")

GMI's reliance on the affidavit of Plaintiffs' expert, Dr. Lorne Everett's

("Dr. Everett") and a USEPA publication[3] fails to establish that the relief articulated by

Plaintiffs is insufficient under Article III.  Dr. Everett states that "[t]o mitigate the threat

to these residents, each home in the Class Area *at a minimum* requires a vapor mitigation

system . . . .  Such systems must be operated for the foreseeable future, *until the source(s)*

*of these toxic vapors can be identified and fully remediated*."  (Doc. No. 17 ¶ 3 (emphasis

added).)  Further, Dr. Everett clearly identified remediation at the source of the vapor

pollution as the final step in eliminating the threat to Plaintiffs.  (*Id.*)  Likewise, the

USEPA publication identifies VMS as an "interim remedial measure[]" and states that

"[r]emoval of the source is the definitive long-term solution," and that other

"intermediate mitigation" methods must be used "to protect the public health" because

elimination of the contamination may take "decades."  (Hayes Decl. ¶ 3, Ex. 1 at 2, 4.)

---

[3]     USEPA report, "Indoor Air Vapor Intrusion Mitigation Approaches"
(October 2008).  (Hayes Decl. ¶ 3, Ex. 1.)

These statements support Plaintiffs' allegations that the additional action and remedies they seek will redress their alleged injuries.  In sum, the injury as alleged by Plaintiffs is not already being fully redressed, but can likely be fully redressed by additional action. That is, Plaintiffs have shown they "face[] a threat of future or ongoing harm," *Park*, 205 F.3d at 1037, and that injunctive relief "will [likely] remedy the alleged harm."  *Steel Co.*, 523 U.S. at 108.  Regardless, Plaintiffs have met their burden with the facts alleged in the SAC, which is what the Court must consider on a 12(b)(1) facial challenge.

As a result, Plaintiffs have Article III standing to pursue the injunctive relief sought,[4] and Defendant's motion to dismiss for lack of standing is denied.

## B.    CERCLA

GMI seeks dismissal of Plaintiffs' injunctive relief claims and Plaintiffs' RCRA claim on the grounds that CERCLA § 113(h) divests this Court of jurisdiction over those claims.

Under CERCLA, a federal district court lacks jurisdiction over any challenge brought by a private citizen under federal or state law to any "removal and remedial action selected under *sections 9604 of [CERCLA], or to . . . any order issued under section 9606(a) of [CERCLA]*."  42 U.S.C. 9613(h).[5]  A claim presents a challenge to CERCLA response actions when it "interferes with" or "impact[s]" the implementation of a planned CERCLA remedy.  *See Cannon v. Gates*, 538 F.3d 1328, 1335 (10th Cir. 2008); *see also Broward Gardens Tenants Ass'n v. E.P.A*, 311 F.3d 1066, 1072 (11th

---

[4]     In addition, Plaintiffs seek non-injunctive relief.  (SAC ¶¶ A-G.)

[5]     For definitions of "removal" and "remedial action," see 42 U.S.C. § 9601.

Cir. 2002).

With respect to the RCRA claim specifically, the right to file suit under RCRA is constrained when a State "is actually engaging in a removal action under section **104 of [CERCLA],**" or when a State "has incurred costs to initiate a Remedial Investigation and Feasibility Study **under section 104 of [CERCLA]** and is diligently proceeding with a remedial action under **that Act**[.]"  42 U.S.C. § 6972(b)(1)(C) (emphasis added); *see also Ark. Peace Ctr. v. Ark. Dep't of Pollution Control*, 999 F.2d 1212, 1217-18 (8th Cir. 1993) (discussing availability of RCRA claims).

Here, it is undisputed by the parties that GMI and the MPCA entered into the 1984 Consent Order and the 2014 Modification—both designed to address pollution at the GMI Facility.  The parties also do not dispute that the MPCA and the USEPA agreed to the Deferral Project.  The parties disagree, however, about the meaning and significance of these and other agreements between the MPCA, the USEPA, and GMI.

Defendant contends that the remedial actions underway at the GMI Site in this case are pursuant to CERCLA.  Defendant argues that the GMI Site's designation as a Federal Superfund Site, the SMOA, and the Deferral Project all show that the USEPA never abdicated its role in the removal and remedial actions, but instead designated the State to act on its behalf, and with continued USEPA oversight.  Defendant specifically argues that the USEPA, acting under CERCLA, vested the MPCA with its role as the designated "lead agency," and with its role in creating and implementing a remedial action plan with GMI.  Defendant argues that all agreements between the State, the

USEPA, and GMI are authorized by CERCLA and constitute a "federal cleanup mission."

On the other hand, Plaintiffs contend that the MPCA acted and continues to act in its capacity as a state agency pursuant only to state law, not under CERCLA. Specifically, Plaintiffs point to the lack of involvement of the USEPA in the creation of the 1984 Consent Order and 2014 Modification, as well as the lack of reference to CERCLA in those documents. Plaintiffs also argue that the USEPA itself denied being involved in the cleanup of the GMI Facility in a 1985 letter to GMI, stating that it had "not joined in the Order by Consent" and that it had not "ma[d]e an evaluation of the appropriateness of the selected remedial action." (Hayes Decl. ¶ 4, Ex. 2.) Plaintiffs further allege that the USEPA website currently states "[it] was not involved with the selection of the remedy at this state-enforcement-lead site," and thus, does not review the implementation of the plan. (Hayes Decl. ¶ 5, Ex. 3.) Finally, Plaintiffs claim that the Deferral Project[6] authorized the MPCA to act under state law ("MERLA") to oversee the GMI site, instead of utilizing oversight and enforcement mechanisms available under the federal CERCLA statute. (*See* Deferral Project at 50.)

The Court concludes that, in this case, the MPCA was acting under state law, not pursuant to CERCLA. As Plaintiff argues, remedial and removal actions at the GMI Site were not put into place under CERCLA Section 9604 or Section 9606. First, none of the existing documents between the relevant parties indicate Section 9604 or Section 9606 authorization. The 1984 Consent Order and the 2014 Modification clearly designates

---

[6]     The GMI Facility is still in the Deferral Pilot Project today. (Hayes ¶ 5, Ex. 3.)

MERLA as the relevant statutory authority, lack any CERCLA reference, and do not involve the USEPA as a party.  (*See* Consent Order at 1 ("This RESPONSE ORDER BY CONSENT (Order) is issued pursuant to the authority vested in the . . . MPCA by the Environmental Response and Liability Act of 1983 (ERLA), Minn. Stat. Ch. 115B, and Minn. Stat. Chs. 115 and 116.").)  The SMOA and Deferral Project also fail to explicitly designate Section 9604 or Section 9606 authorization, and Defendants do not argue otherwise.

Second, the USEPA itself indicates that it was not the authorizing force behind the remedial actions occurring.  In its 1985 letter and its website, the EPA disclaims any responsibility for the GMI Site, stating:  (1) the USEPA has "not joined in the Order by Consent" (Hayes Decl. ¶ 4, Ex. 2); (2) the USEPA has not "ma[d]e an evaluation of the appropriateness of the selected remedial action" (*id.*); (3) the USEPA "was not involved with the selection of the remedy at this state-enforcement-lead site" (Hayes Decl. ¶ 5, Ex. 3.); and (4) the USEPA does not review the implementation of the plan (*id.*).

Third, though the SMOA includes language stating it was made "pursuant to the [CERCLA]," and delineates the responsibilities of each involved agency (Doc. No. 109 at 4), the SMOA also states that the MPCA is responsible for "implementation of a State Superfund program under the ***Minnesota Environmental Response and Liability Act (MERLA)*** Minn. §§115B.01 to 115B.24." (Doc. No. 110-1 (emphasis added).)  Also, the SMOA outlined the action plan for a Minnesota State agency under state law and did not contain language authorizing MPCA to act pursuant to a relevant CERCLA section.

Finally, the Deferral Project designates the MPCA and Minnesota law as the authority under which the project is being administered and explicitly states that the parties agree they are not in a CERCLA process.  (*See* Deferral Project at 50-51.)  The Deferral Project further states that only those sites removed from its purview are under CERCLA jurisdiction—the GMI site was never removed.  (*See id.* at 51; Hayes ¶ 5, Ex. 3.)  The Enforcement Deferral Pilot Project agreement was also not CERCLA-authorized.  The Deferral Agreement articulates that the MPCA had been actively implementing state law "to investigate and cleanup releases of hazardous substances, pollutants, or contaminants," which it would continue to do under the Deferral Project.  (Hayes Decl. ¶ 6, Ex. 4.)  The Deferral Agreement also specified that by assuming responsibility for Deferral Project sites, including the GMI Facility, the MPCA would use "State authorities to investigate and cleanup these sites . . ." and would "conduct[] the necessary enforcement actions available to the State of Minnesota."  (*Id.*)  In the Deferral Agreement, the EPA also stated that it did not plan to take "any Federal action under CERCLA" provided that the state of Minnesota's actions were "protective of human health and the environment" and "not inconsistent with the [National Oil and Hazardous Substances Pollution Contingency Plan ("NCP")[7]]."  (*Id.*)  Given the plain language of the Deferral Project, which is still in effect today, it is not issued pursuant to CERCLA.  The USEPA may have authority to step in should the State fail, however, this is not the same as having authority from the outset.  In sum, in GMI's own language, the

---

[7]     The NCP provides the organizational structure for removal and remedial actions taken under CERCLA.  *See* 40 C.F.R. §§ 300.1, 300.2.

USEPA is deferring to the State, and is not working with the State, unless otherwise

necessary.

Thus, the removal and remediation efforts were pursuant to state law, not

CERCLA, and Plaintiffs' claims are not barred by Section 9613(h).  The Court therefore

denies Defendant's motion to dismiss with respect to a Section 9613(h) bar.

## III.   Sufficiency of the Claims

### A.   CERCLA Claim

GMI seeks dismissal of Plaintiffs' CERCLA claim under Rule 12(b)(6).  An

element of a CERCLA claim[8] is that the release of hazardous substances has caused a

plaintiff to incur "necessary costs of response" that are "consistent" with the National

Contingency Plan.  *See* 42 U.S.C. § 9607(4)(B).  Costs are "[n]ecessary if incurred in

response to a threat to human health or the environment."  *See Ford Motor Co. v. Mich.

Consol. Gas Co.*, Civ. No. 08-13503, 2010 WL 3419502, at *3-4 (D. Mich.

Aug. 27, 2010).  Investigative and monitoring costs may be recoverable if they are

necessary, are tied to cleanup, and are not merely for litigation.  *See id*.; *Village of

Millford v. K-H Holding Corp.*, 390 F.3d 926, 933 (6th Cir. 2004) ("monitoring and

evaluation costs may be recovered as 'removal' costs under CERCLA if they were

---

[8]     To assert a prima facie case under CERCLA, a plaintiff must allege that:
(1) defendant is within one of four classes of covered persons enumerated by 42 U.S.C.
§ 9607(a); (2) a release or threatened release of a hazardous substance from a facility has
occurred; (3) the release or threatened release caused plaintiff to incur response costs; and
(4) those response costs were necessary and consistent with the NCP.  *Control Data
Corp. v. S.C.S.C. Corp.*, 53 F.3d 930, 934-35 (8th Cir. 1995) (citing 42 U.S.C. § 9607
and *United States v. Aceto Agric. Chems. Corp.*, 872 F.2d 1373, 1378-79 (8th Cir. 1989)).

reasonable, and the activities were not scientifically deficient or unduly costly"); *see also*

*Spectrum Int'l Holdings, Inc. v. Universal Coop., Inc.*, Civ. No. 04-99, 2006 WL

2033377, at *4 (D. Minn. July 17, 2006) (citations omitted).  Testing and sampling can

also be necessary if the party seeking costs has an objectively reasonable belief that the

release would contaminate their property.  *Ford*, 2010 WL 3419502, at *3-4.  Overall,

there must be some nexus between the response cost and the effort to respond to

environmental contamination.  *Id.*

GMI argues that Plaintiffs have failed to provide sufficient factual details in their

SAC to show that the costs incurred were recoverable "response costs" that were both

"necessary" and "consistent with the National Contingency Plan."  The Court disagrees.

Here, Plaintiffs have alleged the following:

- Plaintiffs incurred out of pocket costs to evaluate the release or threat of hazardous substances inside their house and to evaluate structural issues concerning approaches to interim mitigation measures (SAC ¶ 32);

- Milbrandt purchased an air filtration system to "prevent, minimize or mitigate damages" (*id.*);

- Plaintiffs' specific type of costs were incurred as "removal" and "response costs" as described in relevant CERCLA provisions, which are referenced in the SAC (*id.*);

- The response and removal costs were necessary and reasonable (*id.*); and

- All cost-incurring actions were taken to protect Plaintiffs' families from vapors (*id.*).

Based on the above factual allegations, the Court concludes that Plaintiffs have

adequately presented facts sufficient to state their claim that the costs were "necessary

and consistent" under CERCLA.  The above factual allegations present enough
specificity "to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at
555.  Thus, GMI's motion to dismiss Count I for failure to state a claim is denied.

### B.      Negligence Claim

GMI seeks dismissal of Plaintiffs' negligence claim under Rule 12(b)(6).  Under
Minnesota law, a claim for negligence requires:  (1) the existence of a duty of care; (2) a
breach of that duty; (3) an injury; and (4) that the breach of duty proximately caused the
injury. *Lubbers v. Anderson*, 539 N.W.2d 398, 401 (Minn. 1995).

GMI argues that Plaintiffs' allegation that their property values have "been
substantially diminished due to the vapor intrusion contamination" is insufficient to state
a claim because Plaintiffs have not alleged "foundational facts to explain ***how*** their
property values diminished."  (Doc. No. 99 at 17 (emphasis in original).)  Defendants
further argue that the alleged injury needs to have actually occurred to state a legally
cognizable tort.  The Court again disagrees with Defendants.

The Court concludes that Plaintiffs' allegation that their property values have
"been substantially diminished due to the vapor intrusion contamination" is sufficient to
state an injury as a part of a claim for negligence.  As Plaintiffs state, "[a]s a matter of
common sense, the presence of significant environmental contamination obviously will
impair the value of a residential property."  (Doc. No. 107 at 24.)  This fact alone makes
Plaintiffs' allegations sufficient under Rule 12(b)(6).  However, as Plaintiffs additionally
explain, the state of Minnesota and the City of Minneapolis both required disclosures on
environmental concerns, indicating an impact on property value. *Osborn*, 918 F.2d

at 729-30 n.4 (citations omitted) (holding that on a Rule 12(b)(1) motion challenging

subject-matter jurisdiction, courts have "authority to consider matters outside the

pleadings").   Moreover, in contrast to the cases cited by Defendants, the injury here is

alleged to have already occurred and continues to occur.   (*See generally* SAC); *cf.*

*Thunander v. Uponor, Inc.*, 887 F. Supp. 2d 850, 865 (D. Minn. 2012) (holding that the

plaintiffs lacked Article III standing because they had not yet determined whether they

had the alleged product defect in their pipe system).   Finally, a precise calculation of

damages is not required by Plaintiffs at this stage and the Court can draw a reasonable

inference based on Plaintiffs' allegations that the value of their properties has been

diminished.   Thus, GMI's motion to dismiss Count II is denied.

### C.    Nuisance Claim

GMI seeks dismissal of Plaintiffs' nuisance claim under Rule 12(b)(6).   Under

Minnesota law, a private nuisance is "[a]nything which is injurious to health, or indecent

or offensive to the sense, or an obstruction to the free use of property, so as to interfere

with the comfortable enjoyment of life or property."   Minn. Stat. § 561.01 (2012).   To

bring a nuisance claim, the party bringing the claim must be the person whose property is

"injuriously affected or whose enjoyment is lessened by the nuisance."   *Id.*   The

interference must be material and substantial.   *Citizens for a Safe Grant v. Lone Oak*

*Sportsmen's Club, Inc.*, 624 N.W.2d 796, 803 (Minn. Ct. App. 2001) (citations omitted).

A court measures whether an interference is material and substantial based on the

standards of ordinary people in the area in which they reside.   *Id.*

GMI argues that Plaintiffs have failed to adequately meet pleading standards with respect to the "material and substantial" interference required to state a claim for nuisance.  GMI argues that Plaintiffs' allegations are no more than "threadbare recitals of a cause of action's elements."  *See Iqbal*, 550 U.S. at 678.

Here, Plaintiffs have alleged that carcinogenic vapors are seeping into and around their properties.  (SAC ¶ 15.)  Plaintiffs have specifically alleged the vapors are toxic.  (SAC ¶¶ 12-15.)  Plaintiffs have alleged that GMI has deemed vapor mitigation appropriate.  (SAC ¶ 7.)  The Court concludes that based on these facts as alleged, the Court can reasonably infer that the vapor's impact is "material and substantial" by the standards of "ordinary" people.  Thus, GMI's motion to dismiss Count III is denied.

### D.    Willful and Wanton Conduct Claim

GMI seeks dismissal of Plaintiffs' willful and wanton conduct claim under Rule 12(b)(6).  To state a claim for willful and wanton negligence, a plaintiff must show that defendant "fail[ed] to exercise ordinary care after discovering another in a position of peril."  *Gage v. HSM Elec. Protection Servs., Inc.*, 655 F.3d 821, 826 (8th Cir. 2011).  To establish a person failed to exercise ordinary care requires that:  "(1) peril was present, and (2) the peril was known to the person," thereby raising negligence to a higher level of willful and wanton negligence.  *Id*.

GMI argues that Plaintiffs have failed to explain the specific harm that GMI could have averted, but did not, because of negligence.  GMI asserts that the conduct alleged with respect to the willful and wanton negligence claim is identical to the conduct

supporting the ordinary negligence claim, and the negligence alleged must have caused some harm distinct from the pre-existing "position of peril." The Court again disagrees.

Plaintiffs allege GMI knew that Plaintiffs were "in a position of peril with respect to vapor contamination" (SAC ¶ 46), and that GMI still "waited until 2013 before performing any vapor testing of the properties in the Class Area[.]" (*Id.*) Plaintiffs' allegations focus on GMI's behavior after it recognized Plaintiffs were potentially exposed to vapor contamination. (*Id.* ¶¶ 46-47.) Specifically, Plaintiffs allege that after learning of possible contamination, GMI "has attempted to avoid or shortcut a thorough response." (*Id.* ¶¶ 47.) Thus, the Court concludes that these allegations are sufficient to state a claim for willful and wanton negligence, and GMI's motion to dismiss with respect to Count IV is denied.

### E.     RCRA Claim

Finally, GMI seeks dismissal of Plaintiffs' RCRA claim on the grounds that Plaintiffs failed to satisfy the mandatory pre-suit notice requirements.

To bring a claim under RCRA, a plaintiff must provide at least 90 days' notice of alleged violations to the USEPA, the state in which the violation occurred, and the alleged violator. 42 U.S.C. 6972(b)(2)(A); *see also Hallstrom v. Tillamook Cnty.*, 493 U.S. 20, 33 (1989) (stating that the notice requirements are a mandatory, not optional precondition of suit). The notice provision seeks to "discourage citizen suits when compliance is at hand" and to "allow . . . Government agencies to take responsibility for enforcing environmental regulations, thus obviating the need for citizen suits." *Furrer v. Brown*, 62 F.3d 1092, 1098 (8th Cir. 1995). Where notice requirements have not been

met, a district court does not have subject matter jurisdiction to hear a claim.  *See Ascon*

*Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1160 (9th Cir. 1989).  Notice must identify:

> [S]ufficient information to permit the recipient to identify the specific
> permit, standard, regulation, condition, requirement, or order which has
> allegedly been violated, the activity alleged to constitute a violation, the
> person or persons responsible for the alleged violation, the date or dates of
> the violation, and the full name, address, and telephone number of the
> person giving notice.

40 C.F.R. § 254.3(a).

GMI asserts that Plaintiff Milbrandt failed to provide any pre-suit notice under

RCRA, and therefore her RCRA claims must be dismissed.  GMI asserts that each

plaintiff must meet notice requirements and Milbrandt cannot be included as part of Ebert

and Krauze's notice.  GMI further argues that Ebert and Krauze's notice was inadequate

as a matter of law because it did not contain "sufficient information" under RCRA to

GMI.  Specifically, GMI claims that the Ebert and Krauze's notice letter failed to:

(1) adequately identify each pollutant at issue; (2) adequately identify the alleged dates of

violations; and (3) clearly allege the amount of unsafe levels associated with TCE.

With respect to Milbrandt, the Court concludes that Ebert and Krauze's notice was

sufficient to constitute adequate notice under RCRA for Milbrandt.  The letter

specifically states that it was "on behalf of all others similarly situated."  (Hulse Decl.

¶ 7, Ex. 4 ("Notice Letter").)  The area impacted by the alleged release of hazardous

substances is finite, not extremely large, and is defined and known to GMI.  GMI can

easily know, and presumably does know, each and every house in the possible zone of

the release), including Milbrandt's home.  (*See, e.g.*, Consent Order (with attached maps

and legal descriptions of the Area).)  GMI was able to know and identify the problems

and how to act with respect to Milbrandt.  The Notice Letter thus meets RCRA notice

requirements.

     With respect to Ebert and Krauze's notice, the Court also concludes that Plaintiffs'

detailed descriptions in their notice letter were sufficient to put GMI on notice of the

problems at issue, as well as to provide a sufficient idea of how GMI could come into

compliance with those alleged problems.  Plaintiffs' letter detailed the wrongful conduct,

the location of that conduct, the consequences of that conduct, and the potential actions to

come into compliance.  Thus, the notification provided was sufficient to allow GMI to act

and comply.  The Court denies GMI's motion to dismiss Count V.

## CONCLUSION

     Plaintiffs have met their jurisdictional and pleading burdens under Federal

Rules 12(b)(1) and 12(b)(6) at this phase in the proceedings.

## ORDER

     Based on the foregoing, and all the files, records, and proceedings herein, **IT IS**

**HEREBY ORDERED** that:

     1.    Defendant's Motion to Dismiss the Second Amended Complaint (Doc.

No. [97]) is **DENIED**.


Dated:  September 4, 2014         s/Donovan W. Frank
                                   DONOVAN W. FRANK
                                   United States District Judge