# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Karl Ebert, Carol Krauze, and
Jackie Milbrandt, individually and
on behalf of all persons similarly situated,

Civil No. 13-3341 (DWF/JJK)

                    Plaintiffs,

v.

**MEMORANDUM
OPINION AND ORDER**

General Mills, Inc.,

                    Defendant.

---

Edward J. Manzke, Esq., and Shawn M. Collins., Esq., The Collins Law Firm PC;
Michael D. Hayes, Esq., and Norman B. Berger, Esq., Varga Berger Ledsky Hayes &
Casey; and Anne T. Regan, Esq., and J. Gordon Rudd, Jr., Esq., Zimmerman Reed,
PLLP; and Mark H. Thieroff, Esq., Siegel Brill, P.A., counsel for Plaintiffs.

Benjamin W. Hulse, Esq., Corey Lee Gordon, Esq., Emily A. Ambrose, Esq., and
Jerry W. Blackwell, Esq., Blackwell Burke PA; and Jeffrey Fowler, Esq., O'Melveny &
Myers LLP; and Mark J. Carpenter, Esq., Carpenter Law Firm PLLC, counsel for
Defendant.

---

# INTRODUCTION

This matter is before the Court on the following motions:  (1) Plaintiffs Karl Ebert

("Ebert"), Carol Krauze ("Krauze"), and Jackie Millbrandt's ("Millbrandt"), all

individually and on behalf of all persons similarly situated (together, "Plaintiffs"),

Amended Motion to Certify Class[1] (Doc. No. 93); (2) Defendant General Mills, Inc.'s

---

[1]     Plaintiffs' initial motion to certify the class (Doc. No. 13) was terminated in
April 2014, and Plaintiffs filed the present Amended Motion to Certify Class at that time.

("GMI" or "Defendant") Motion to Exclude Expert Testimony and Opinions of

Dr. David Ozonoff (Doc. No. 119); and (3) GMI's Motion to Exclude Expert Testimony

and Opinions of Dr. Lorne G. Everett (Doc. No. 124).  For the reasons set forth below,

the Court grants Plaintiffs' motion and denies Defendant's motions.

## BACKGROUND

This dispute is a putative class action brought by Plaintiffs alleging that GMI

caused the chemical substance trichloroethylene ("TCE") to be released into the area

surrounding a former GMI facility (the "Facility") in the Como neighborhood in

Minneapolis, Minnesota.  Plaintiffs allege that the TCE, in the form of vapors, is

threatening home and business owners in that area.  Much of the background for this case

is set forth in detail in the Court's recent Memorandum Opinion and Order relating to

GMI's motion to dismiss.  (Doc. No. 151.)  The Court incorporates the factual

background from that Memorandum Opinion and Order by reference here.  The parties

have also provided the following additional background for purposes of this motion.

The Como neighborhood implicated by this suit is primarily residential, but was

historically industrial and is currently surrounded by various industrial uses.  (*See* Doc.

No. 118 ("Hulse Decl.") ¶ 4, Ex. B ("McHugh Report & Decl.") at 13-18.)  GMI points

to a number of nearby facilities that were likely users of solvents, including TCE.

(McHugh Report & Decl. at 15.)  GMI's experts, Mr. McHugh and Mr. Mercer, state that

these other sources have also caused contamination in the groundwater in Como.  (*See*

McHugh Decl. at 18-21; Hulse Decl. ¶ 5, Ex. C ("Mercer Decl.") at 32, 34, 37.)

Mr. McHugh also states that household products can account for the presence of TCE

vapors inside a household.  (McHugh Decl. at 19-20.)  Plaintiffs allege that GMI's history with respect to the area surrounding the facility shows that GMI was the substantial cause of the neighborhood's TCE contamination via the approximately 15,000 gallons of disposal of certain solvents into the groundwater between 1947 and 1962.  For example, in 1984 Barr Engineering outlined the geographic boundaries of the TCE contamination associated with the Facility.  (*See* Doc. No. 136-4; *see also* Doc. No. 136-6 (GMI correspondence relating to the contamination); Doc. No. 136-7 (court testimony regarding the source of the contamination).)  Plaintiffs also refer to a number of state agency documents reflecting the same.  (*See, e.g.*, Doc. Nos. 136-12, 136-13, 136-14, 136-15, 136-16.)  One of Plaintiffs' experts, Dr. Lorne G. Everett ("Dr. Everett"), states that GMI's disposal of "large quantities of toxic chemicals, including TCE, at the Facility, has resulted in widespread soil vapor contamination," and that he bases his opinion on a review of scientific data.  (Doc. No. 136-18 at 11-16.)

In or around 1981, GMI conducted an investigation of the soil and groundwater around the Facility.  (McHugh Report & Decl. at 3.)  Levels of TCE differ between the soil and the groundwater in the Como area.  (McHugh Report & Decl. at 3, 9-11.) In 1984, GMI signed an agreement formalizing their arrangement to conduct remedial action to address TCE in the groundwater around the Facility, including the implementation of a pump-and-treat system.  (*Id.* at 3-4.)  The pump-and-treat system was shut down in 2010.  (*Id.*)

In 2013, an evaluation of the area around the Facility showed the presence of TCE vapors.  (McHugh Decl. at 20-21.)  GMI then agreed to a program whereby soil beneath

building foundations would be tested and Vapor Mitigation Systems ("VMSs") would be installed where TCE soil vapors are reported at levels above 12 micrograms per cubic meter ($\mu g/m^3$). GMI has installed such VMSs and has also installed VMSs in certain homes with less than 20 $\mu g/m^3$ where adjacent properties exceed that amount. (McHugh Decl. at 40; Hulse Decl. ¶ 3, Ex. A ("Borak Decl.") ¶ 15.) According to Mr. McHugh, 327 homes in the Como neighborhood have had soil vapor testing and do not have detectable TCE concentrations. (McHugh Decl. at 41.) VMSs have been installed in 118 homes. (Hulse Decl. ¶ 10, Ex. H at 3.) The named Plaintiffs have received customized VMSs. (*See* Doc. No. 100-3; *see also* Hulse Decl. ¶ 11, Ex. I ("Krauze Dep.") at 113-17.) GMI's expert, Mr. Borak, states that the VMSs are "highly protective" for residents. (Borak Decl. ¶ 21.) Plaintiffs point to evidence that vapors persist. (*See, e.g.*, Doc. No. 136-18 at 19, 26-28.)

Plaintiffs assert five legal claims on a class basis: (1) violation of the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"); (2) common law negligence; (3) private nuisance; (4) willful and wanton misconduct; and (5) violation of the Resource Conservation and Recovery Act ("RCRA"). (Doc. No. 87, Second Am. Compl. ("SAC") at ¶¶ 26-61.) Plaintiffs appear to seek certification of only the following narrow issues: (1) whether GMI is liable to owners of the properties in the defined Class Area; and (2) whether injunctive relief is warranted to compel comprehensive remediation. (*See* Doc. Nos. 15, 135.)

**DISCUSSION**

Plaintiffs seek class certification, and Defendant has moved to exclude the testimony of two of Plaintiffs' experts, Dr. Everett and Dr. David Ozonoff ("Dr. Ozonoff"), under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).  The Court will address Defendant's *Daubert* motions first because the evidence presented by these experts is relevant to the Court's determination on whether class certification should be granted.

## I.     Motions to Exclude Expert Testimony

### A.     Legal Standard

Before accepting the testimony of an expert witness, the trial court is charged with a "gatekeeper" function of determining whether an opinion is both relevant and reliable. *Daubert*, 509 U.S. at 589-90.  Under Federal Rule of Evidence 702, which governs the admission of expert testimony, an expert may testify if:  (1) the expert's scientific, technical, or other specialized knowledge will help the fact-finder to understand the evidence or determine a fact in issue; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; and (4) the expert has reliably applied those principles and methods to the facts of the case.  *See also Lauzon v. Senco Prods., Inc.*, 270 F.3d 681, 686 (8th Cir. 2001).

The Court's focus should be on a preliminary assessment of "whether the reasoning or methodology underlying the testimony is scientifically valid" and "whether that reasoning or methodology properly can be applied to the facts in issue." *Daubert*, 509 U.S. at 592–93; *see also United States v. Dico, Inc.*, 266 F.3d 864, 869 (8th

Cir. 2001).  In determining whether the proposed expert testimony is reliable, the Court

can consider:  (1) whether the theory or technique can be and has been tested; (2) whether

the theory or technique has been subjected to peer review and publication; (3) the known

rate of potential error; and (4) whether the theory has been generally accepted.  *Daubert*,

509 U.S. at 593-94.

When examining an expert opinion, a court applies a general rule that "the factual

basis of an expert opinion goes to the credibility of the testimony, not the admissibility,

and it is up to the opposing party to examine the factual basis for the opinion in

cross-examination."  *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929 (8th Cir. 2001)

(citation and quotation omitted).  However, "if the expert's opinion is so fundamentally

unsupported that it can offer no assistance to the jury," then it must be excluded.  *Id.* at

30.  In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), the Supreme Court

concluded that "the trial judge must have considerable leeway in deciding in a particular

case how to go about determining whether particular expert testimony is reliable."  526

U.S. at 152.

The application of the *Daubert* test, however, is somewhat limited at the stage of

class certification.  *See In re Zurn Pex Plumbing Prods. Liab. Litig.,* 644 F.3d 604,

610-14 (8th Cir. 2011) (holding that district courts may properly apply a "focused" or

"tailored" *Daubert* inquiry at the class certification stage).  *Daubert* is helpful at the class

certification stage in guarding against certification of a class that is based on expert

opinion from a methodology so apparently flawed that it is inadmissible as a matter of

law.  *See In re Visa Check/Mastermoney Antitrust Litig.*, 192 F.R.D. 68, 76-77

(E.D.N.Y 2000); *In re Potash Antitrust Litig.*, 159 F.R.D. 682, 695-98 (D. Minn. 1995)

(finding that plaintiffs are required only to make a "threshold showing" of whether proof

will be "sufficiently generalized").  The *Daubert* inquiry at this procedural stage,

therefore, only scrutinizes the reliability of expert testimony in light of the criteria

for class certification and the current state of the evidence.  *Zurn Pex*, 644 F.3d at 614.

While "[t]he main purpose of *Daubert* exclusion is to protect juries from being

swayed by dubious scientific testimony," at the class certification stage, the Court, not a

jury, is the decision maker, and therefore a less stringent analysis is required.  *Id.* at 613.

Thus, expert disputes at class certification are resolved only to the extent necessary to

determine the nature of the evidence that would be sufficient, if the plaintiff's general

allegations were true, to make out a prima facie case of class liability.  *Id.* at 611 (quoting

*Blades v. Monsanto Co.,* 400 F.3d 562, 567 (8th Cir. 2010)).  It would be inappropriate to

evaluate expert opinions on the conclusions they generate and a court should rather

"focus . . . solely on principles and methodology." *Id.* at 615 (quoting *Daubert*, 509 U.S.

at 595).  A party and its experts should not be expected to have fully evaluated all data at

the preliminary stage of class certification.  *Id.* at 611-612.  Furthermore, class

certification is a "tentative," "preliminary," and "limited" determination.  *Id.* at 613

(internal citations omitted).

## B.   Dr. Everett

### 1.   Background

Dr. Everett has practiced Environmental Science for more than 40 years,

specifically focusing on contaminant migration in groundwater, soil, and vapor intrusion

located in the vadose zone (the area between the water table and land surface).[2]  (Doc.

No. 126 ("Gordon Decl.") ¶ 4, Ex. 1 ("Dr. Everett Report") at 2 (improperly labeled as

Exhibit 2).)  Dr. Everett has received awards for his work in the field of environmental

sciences.  (*Id.* at 61.)

Currently, Dr. Everett is the Chief Scientist, President, and CEO of L. Everett &

Associates.  (*Id.* at 5, 61.)  For the past 18 years, Dr. Everett also served as the Charter

Chairman for the American Society for Testing and Materials International task

committee on Vadose Zone Monitoring in which he developed eleven national ASTM

Vadose Zone Monitoring standards, with four being related to soil gas monitoring and

vapor intrusion.  (*Id.* at 5-6.)  Dr. Everett has presented before Congress on numerous

occasions and holds many positions on different panels related to environmental sciences.

(*Id.* at 61.)  Dr. Everett has worked with a number of federal agencies and in multiple

capacities.  (*Id.* at 7-9.)  Dr. Everett writes extensively on the topic of the vadose zone

and the migration of hazardous waste.  (*See Id.* at 6-8, 61.)

In his expert report, Dr. Everett essentially opines that GMI's past disposal of

toxic chemicals at its the Facility is the source of TCE groundwater and soil vapor

problems in the proposed Class Area, which poses an imminent and substantial

endangerment to human health and the environment.  (*Id.* at 9-12.)  More specifically,

Dr. Everett opines that the evidence is consistent with GMI as the source of

contamination.  (*See generally id.*)

---

[2]     Dr. Everett holds an Honorary Doctor of Science Degree from Lakehead
University (1996) in Canada, a Ph.D. in hydrology from the University of Arizona
(1972), and a M.S. in Limnology from the University of Arizona (1969).  (*Id.* at 6, 61.)

2.      **Analysis**

Dr. Everett was asked to opine on conditions relating to potential soil, groundwater, and air contamination in and around the Facility.  (*See generally* Dr. Everett Report.)  Defendant argues Dr. Everett failed to reliably apply proper principles and methods in developing his opinions.  Defendant asserts that Dr. Everett derived his opinions that "substantially all of this groundwater contamination originates from the General Mills Facility," and that "there is no other known source of vapor contamination in the proposed class area" by using a flawed application of his own methodology and by relying on incomplete data and therefore, that those opinions should be excluded.  (Doc. No. 125 at 14.)  Specifically, GMI asserts that this flawed application resulted in Dr. Everett using an area that was too small and wrongly centered when identifying possible sources causing contamination.  This includes his alleged disregard for certain upgradient sites that could be possible contributors to TCE in the Proposed Class Area. According to Defendants, absent this testimony, Plaintiffs fail to adequately establish a common source of the contaminant and therefore cannot meet requirements for class certification.  The Court disagrees.

First, although not in dispute, the Court notes Dr. Everett's substantial qualifications and expertise to opine on issues of soil and groundwater contamination at the General Mills site.  Second, the parties agree that the Court is tasked with examining the soundness of Dr. Everett's methodology, not with evaluating his conclusions or the correctness of his opinions.  *Zurn Pex*, 644 F.3d at 615.  Dr. Everett's Expert Report and Rebuttal Affidavit show that Dr. Everett employed the "multiple lines of evidence

methodology." As Plaintiffs note, courts have determined that that methodology is reliable and it is similarly reliable here. (Doc. No. 137 at 17-18 (citing *Abrams v. Ciba Specialty Chem. Corp.*, Civ. No. 08-68, 2010 WL 779276, at *9 n.15 (S.D. Ala. Mar. 2, 2010)).) Dr. Everett did not fail to follow his own methodology. Instead, he considered a number of factors and scientific data consistent with the multiple lines of evidence methodology. Further, Dr. Everett did not fail to follow his own methodology when centering this search radius on the plume as the site of interest rather than the General Mills facility. Dr. Everett thoroughly explained the reasons for, and applicable standards behind, his methodology of focusing on the plume. The same is true of his search radius which was consistent with accepted standards and methodologies in the field. (Doc. No. 134, Everett Rebuttal at 6.)

Finally, Dr. Everett also did not fail to follow his own methodology when he examined Frank's Auto Repair and Anne Gendein Trust as possible additional sources of contaminant. Based on the data available to him at the time, Dr. Everett fully considered and excluded these two possible sources consistent with his methodology of appropriately assessing other potential sites. Additionally, Dr. Everett considered these sites a second time with the additional data which Defendant argues Dr. Everett failed to consider. Consistent with the methodology applied in the field, Dr. Everett fully considered other possible and reasonable sources of contamination and did not fail to reliably apply his own, well accepted methodology.

If Defendant wishes to show that there are other sites that impact the plume, they may do so with their own experts and in cross-examining Dr. Everett, but this does not

change the fact that Dr. Everett properly applied his methodology. At its essence,

Defendant's dispute lies with Dr. Everett's scientific conclusions, not his adherence to his

own methodology. Defendant here fails to establish that there is too great of an analytical

gap between the data and the opinion proffered. *Junk*, 628 F.3d at 448. Instead,

Defendant's concerns with Dr. Everett's testimony go directly to the credibility of his

testimony, and not its admissibility. Defendant will have to examine the factual basis for

his opinion on cross examination. *See Bonner*, 259 F.3d at 929.

In sum, the Court cannot conclude that Dr. Everett's opinion is so flawed that it is

inadmissible as a matter of law. *In re Visa Check/Mastermoney*, 192 F.R.D. at 76-77.

Dr. Everett's opinions are therefore appropriately considered by this Court in its

examination of class certification and will not be excluded under *Daubert* and Rule 702

at this time.

## C.    Dr. Ozonoff

### 1.    Background

Dr. Ozonoff is an epidemiologist, physician, professor of Environmental Health,

and Chair Emeritus at Boston University School of Public Health. (Doc. No. 121

("Ambrose Decl.") ¶ 3, Ex. A ("Report of Dr. Ozonoff"), at 148.)[3] He specializes and

teaches on the epidemiology of diseases, specifically those caused by exposure to toxic

chemicals and other environmental agents. (*Id.* at 3.) Dr. Ozonoff served as the Chair for

---

[3]    Dr. Ozonoff is currently licensed to practice medicine in Massachusetts.
Dr. Ozonoff received his M.D. in 1967 from Cornell University Medical College and his
M.P.H. in 1968 from Johns Hopkins University School of Hygiene and Public Health.
(Report of Dr. Ozonoff, at 148.)

the Department of Environmental Health at the Boston University School of Public

Health from 1977-2003.  (*Id.* at 3, 149.)  Since 1977, Dr. Ozonoff taught and continues to

teach environmental health to doctoral and masters candidates, including courses on

*Cancer Toxicology* and *Toxicology and Epidemiology of the Chlorinated Ethylenes*.  (*Id.*

at 3.)  Dr. Ozonoff has received numerous honors for his work related to toxicology and

epidemiology, specifically the effects of toxic chemicals on the human body.  (*Id.* at

148-49.)  Dr. Ozonoff has worked for a variety of different agencies at the federal, state,

and international level.  (*Id.* at 5.)  Dr. Ozonoff has authored over 100 articles and reports

on science and public health related issues, with many focused specifically on the effects

of TCE.  (*See id.* at 5, 53-62.)  Dr. Ozonoff has testified in court numerous times for the

past 30 years and has presented numerous lectures on the use of science in the courtroom.

(*Id*. at 164-65.)

In part, Dr. Ozonoff's expert report opines that TCE is a carcinogen that poses an

imminent and substantial danger to the residents of the proposed Class Area and that the

weight-of-evidence methodology favors the proposition that exposure to TCE found in

the proposed Class Area through inhalation presents an increased and unacceptable risk

of cancer and other negative health effects.  (*Id.* at 2, 48.)

### 2.    Analysis

Dr. Ozonoff was asked to opine on whether the "environmental contamination of

the proposed Class Area . . .  constitute[s] a public health risk to the affected population."

(Ozonoff Report, Ex. A at 1.)  The parties agree that to state a claim under the Resource

Conservation and Recovery Act ("RCRA"), Plaintiffs must establish that class members

face "imminent and substantial endangerment."  42 U.S.C. § 6972(a).  Plaintiffs must be

able to show that their claims of a generalized health threat and "imminent and

substantial" danger apply on a class-wide basis.  With respect to Dr. Ozonoff, Defendant

asks the Court to disregard his report and opinions relating to the "imminent and

substantial endangerment" caused by TCE in making its class certification decision

because his opinions are not sufficiently reliable or relevant under Federal Rule of

Evidence 702 and *Daubert*.

First, Defendant argues that Dr. Ozonoff's opinions on "imminent and substantial

danger" are not supported by either exposure data or a risk assessment.  Specifically,

Defendant asserts that Plaintiffs must show the proposed class is affected in a uniform

and homogenous manner.  According to Defendant, because Dr. Ozonoff failed to

examine any actual exposure data and did not conduct a "risk characterization," as that is

defined by the Public Health Community, he cannot opine on this issue.

The Court finds no support for Defendant's argument that there need be uniform

contamination for all Plaintiffs.  Although it is the case that Plaintiffs must show that

TCE presents an "imminent and substantial danger" to health or the environment,

Plaintiffs need not show that the threat is homogenous.  *See, e.g.*, *Smith v. ConocoPhillips

Pipe Line Co.*, 298 F.R.D. 575, 585 (E.D. Mo. 2014) ("It is sufficient under Rule 23(b)(2)

if class members complain of a pattern or practice that is generally applicable to the class

as a whole.  Even if some class members have not been injured by the challenged

practice, a class may nevertheless be appropriate."); *Mejdrech v. Met-Coil Sys. Corp.*,

319 F.3d 910, 911-12 (7th Cir. 2003) (allowing claimant-specific issues such as the

degree to which each property is contaminated to proceed as a class action).  Moreover, such a question does not go to Dr. Ozonoff's reliability and is more properly addressed in the Court's discussion on typicality, below.  However, whether or not Dr. Ozonoff examined actual and reliable data and properly applied the methodology of his field when assessing risk, do relate to his reliability.  The Court concludes that Dr. Ozonoff's opinion is sufficiently reliable with respect to the data applied and methodology used to overcome Defendant's *Daubert* challenge at this phase in the proceedings.  Dr. Ozonoff opines that TCE at certain levels presents a significant immediate and future risk in the Class Area.  He bases his opinion on the data upon which GMI relied when deciding to install VMSs in 2013.  Should Defendant wish to challenge this data with different data, Defendant's challenge is appropriate for cross examination and does not speak to Dr. Ozonoff's reliability.

Second, Defendant argues that Dr. Ozonoff is merely applying the "precautionary principle" in asserting that the protective level for TCE is "zero"—meaning if something might cause problems, avoiding it will not cause harm, and may cause good.  Further, Defendant argues Dr. Ozonoff in fact admits that some levels of TCE may be acceptable.

Again, these are fact and credibility questions that Defendant may challenge, but which do not go to Dr. Ozonoff's reliability.  Similarly, Defendant's argument that potential risks of exposure must be determined on an individual basis does not impact his reliability, and additionally is not accurate in light of the Court's discussion below, which concludes that questions on individualized exposure will not be addressed as part of those questions for which the Court will agree to certify the class.

Finally, Defendant argues that to the extent Dr. Ozonoff opines on the impact of TCE on residential real estate markets, he is unqualified and his opinion should be excluded. Thus, it is inadmissible *ipse dixit*. The Court agrees on this ground, and concludes that Dr. Ozonoff's opinion as it relates to the real estate market is outside of his area of expertise and cannot be relied upon by Plaintiffs at the class certification stage.

In sum, the Dr. Ozonoff's opinions are appropriately considered by the Court in its examination of class certification, except as they relate to real estate market, and will not be excluded under *Daubert* and Rule 702 at this time.

## II.     Motion for Class Certification

### A.     Legal Standard

A class action serves to conserve the resources of the court and the parties by permitting an issue that may affect every class member to be litigated in an economical fashion. *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 155 (1982). Rule 23 of the Federal Rules of Civil Procedure governs class certification and requires that "[t]o be certified as a class, plaintiffs must meet all of the requirements of Rule 23(a) and must satisfy one of the three subsections of Rule 23(b)." *In re St. Jude Med., Inc.*, 425 F.3d 1116, 1119 (8th Cir. 2005) (citations omitted). Specifically,

> The Rule 23(a) requirements for class certification are: (1) the putative class is so numerous that it makes joinder of all members impracticable; (2) questions of law or fact are common to the class; (3) the class representatives' claims or defenses are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

*Id*. (citing Fed. R. Civ. P. 23(a)).

Rule 23(b)(1) requires a plaintiff to establish that "prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class."  Fed. R. Civ. P. 23(b)(1). Rule 23(b)(2) allows for certification if a plaintiff establishes that a defendant has "acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole[.]"  Fed. R. Civ. P. 23(b)(2).  Rule 23(b)(3) requires that:  (1) common questions of law or fact predominate over questions affecting only individual members; and (2) that proceeding as a class action is the superior method of adjudication.  Fed. R. Civ. P. 23(b)(3).

District courts retain broad discretion in determining whether to certify a class. *Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*, 678 F.3d 640, 645 (8th Cir. 2012).  However, the court must conduct a "rigorous analysis" to ensure that the prerequisites of Rule 23 are satisfied.  *Elizabeth M. v. Montenez*, 458 F.3d 779, 784 (8th Cir. 2006) (citing *Gen. Tel. Co. of S.W. v. Falcon,* 457 U.S. 147, 161 (1982)).  "The preliminary inquiry of the class certification stage may require the court to resolve disputes going to the factual setting of the case, and such disputes may overlap the merits of the case."  *Luiken v. Domino's Pizza, LLC*, 705 F.3d 370, 372 (8th Cir. 2013) (citation omitted).  "Nonetheless, such disputes may be resolved only insofar as resolution is necessary to determine the nature of the evidence that would be sufficient, if the plaintiff's general allegations were true, to make out a prima facie case for the class."

*Blades v. Monsanto Co.*, 400 F.3d 562, 567 (8th Cir. 2005).  The party seeking class

certification carries the burden of proof regarding the requirements of Rule 23.  *Coleman*

*v. Watt*, 40 F.3d 255, 258 (8th Cir. 1994).

###  B.     Rule 23(a) Requirements

Plaintiffs seek certification of the following class:  "[A]ll persons and

non-governmental entities that own residential property within the 'Class Area.'"[4]  (Doc.

No. 87 at ¶ 20.)  Plaintiffs seek certification of the following:  (1) whether GMI is liable

to owners of the properties in the defined Class Area; and (2) whether injunctive relief is

warranted to compel comprehensive remediation.  (*See* Doc. Nos. 15, 135.)

Defendants do not appear to dispute either that the proposed class satisfies the

numerosity and commonality requirements of Rule 23(a) or the adequacy of Plaintiffs'

counsel to act as Class Counsel.[5]  Instead, Defendant opposes certification on the

following Rule 23(a) grounds:  (1) adequacy; and (2) typicality.  Defendant also argues

the class is not ascertainable.  Defendant further opposes certification under all of the

Rule 23(b) provisions.  Below, the Court considers whether Plaintiffs meet these

Rule 23(a) and Rule 23(b) factors in the context of Defendant's arguments.

---

[4]     The "Class Area" is based on the geographic boundaries depicted in the figure
attached to the SAC as Exhibit 1.  (Doc. No. 87 at ¶ 20, Ex. 1.)

[5]     Even so, the Court notes that the Court is satisfied that Plaintiffs' counsel are able
and willing to competently and vigorously prosecute the action, thus satisfying
Rule 23(a)(3) and (4) with respect to adequacy of counsel.  The Court addresses
numerosity and commonality below.

### 1.    Numerosity & Commonality

Defendant does not dispute that Plaintiffs meet the numerosity and commonality requirements.  Therefore, the Court only briefly addresses each in turn.  Under Rule 23(a)(1), a class action may only be maintained if "the class is so numerous that joinder of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  In general, a putative class with over forty members meets this requirement.  *See Alberts v. Nash Finch Co.*, 245 F.R.D. 399, 409 (D. Minn. 2007).  With at least two hundred identifiable properties in the proposed Class Area, Plaintiffs easily meet this requirement.

For commonality, there must be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  Here, Plaintiffs allege standardized conduct by Defendant that contaminated the proposed Class Area and seek the same remedies as a result.  The commonality threshold is also met.

### 2.    Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  Generally, where "claims or defenses of the representative parties and the members of the class stem from a single event or are based on the same legal or remedial theory," typicality is met.  *See Paxton v. Union Nat'l Bank*, 688 F.2d 552, 561-62 (8th Cir. 1982).  "[I]n some circumstances, the test for typicality is 'fairly easily met so long as other class members have claims similar to the named plaintiff.'"  *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 329 (D. Minn. 2005) (citing *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174 (8th Cir. 1995)).

Defendant argues that Plaintiffs are not typical because they have unique causation issues, differing mitigation statuses, and differing loss-of-use claims.  Defendant states that "the nature, extent, and cause of contamination is [sic] unique to each property within the proposed Class Area."  (Doc. No. 117 at 24.)  Specifically, according to Defendant, Plaintiffs cannot show that GMI was the cause of contamination at each individual property.  Defendant further asserts that potential health risks must be determined on a property-specific basis and that this requirement is particularly true in light of the differing amount of relief already received—that is, some homes have received VMSs and others have not.  Finally, Defendant argues that the individuals at each property have differing degrees and types of use of their property.

Here, the named plaintiffs and the members of the proposed class seek the same remedy, and they do so based on the same events (GMI's alleged release of chemicals into the Como neighborhood), as well as on the same legal theories.  Plaintiffs' claims are premised on the following core issues:  whether GMI caused TCE to be released at the Facility; whether those releases have resulted in the existence of vapor-form TCE in the Class Area which surrounds the Facility; whether GMI is liable for any vapor contamination in the Class Area; whether TCE vapor has caused damage; and whether abatement should be ordered.  Further, Plaintiffs present, and the Court has considered, preliminary evidence of completed testing that supports Plaintiffs' claims that the Class Area contains TCE vapors and that GMI disposed of TCE at the Facility.

As Plaintiffs note, differing levels of contamination and different use and treatment of each property do not defeat typicality at the class certification stage.  *See,*

*e.g.*, *LeClerq v. Lockformer Co.*, Civ. No. 00-7164, 2001 WL 199840, at *4-5 (N.D. Ill. Feb. 28, 2001) (concluding that any different levels of contamination in the proposed class area did not defeat typicality because the plaintiffs alleged that a single course of conduct caused the same type of injury to all proposed class members); *see also McHugh v. Madison-Kipp Corp.*, Civ. No. 11-724 (W.D. Wis. Apr. 16, 2012) (Doc. No. 136-2) (finding that Plaintiffs satisfied typicality requirements, "despite minor difference in the experiences of the class members, the claims of all class members rely on the same legal theory and arise out of the same course of conduct"). Plaintiffs allege that the existence of the TCE vapor is the damage suffered by all class members and present preliminary evidence that it is the result of Defendant's uniform course of conduct. Therefore, Defendant's arguments relating to the unique nature of each property in this case do not defeat typicality and the typicality bar is met.

### 3.      Adequacy

Under Rule 23(a)(4), Plaintiffs must establish that "the representative parties will fairly and adequately protect the interests of the class" for purposes of certification. Fed. R. Civ. P. 23(a)(4). This requirement has two prongs: (1) the representatives' attorney must be qualified and willing and able to prosecute the case competently and vigorously; and (2) the named Plaintiffs' interests must not diverge from the interests of the class as a whole. *See Parkhill v. Minn. Mut. Life Ins. Co.*, 188 F.R.D. 332, 339 (D. Minn. 1999); *Sonmore v. CheckRite Recovery Servs., Inc.*, 206 F.R.D. 257, 263 (D. Minn. 2001) (citing *Paxton,* 688 F.2d at 562-3) ("The focus of Rule 23(a)(4) is whether: (1) the class representatives have common interests with the members of the class, and (2) whether the

class representatives will vigorously prosecute the interests of the class through qualified counsel."). A court must ascertain whether the proposed class representatives have "a sufficient incentive to represent the class members." *Id.* (citing *In re Milk Prods. Antitrust Litig.,* 195 F.3d 430, 437 (8th Cir. 1999)). "A named plaintiff who lacks the desire to 'vigorously pursue' the interests of potential class members is not a fair and adequate representative of the class." *Id.* (citation omitted).

Defendant does not argue that the named Plaintiffs' attorneys are inadequate, and the Court sees no indication that this would be the case. (*See supra* at 17 n.5.) Defendant does argue, however, that the class representatives do not protect the interests of absent members who have personal injury claims. Defendant argues that Minnesota law does not allow for the "splitting" off and reserving for separate litigation of personal injury claims from other claims. Defendant's argument is based on principles of *res judicata*.

The adequacy determination is complicated in this case. Plaintiffs have voluntarily excluded any personal injury claims and seek only property damages and injunctive relief not relating to personal injury claims. The Court agrees with Defendant that this presents concerns for absent class members that the Court must consider—both for absent class members who have *present* personal injury claims and also who have potential *future* personal injury claims.

First, the Court acknowledges that Minnesota recognizes a general rule against claim splitting, which is essentially based on principles of *res judicata*. *See Brown-Wilbert, Inc. v. Copeland Buhl & Co., PLLP*, 732 N.W.2d 209, 222-25 (Minn. 2007). Under this rule, parties are prevented from splitting personal injury claims from

other claims because by bringing and adjudicating one type of claim, a party may be barred from later bringing the other claims on principles of *res judicata*. *See id.*

A number of courts have declined to certify a class based on a finding that representation was inadequate where plaintiffs split claims. *See, e.g.*, *Thompson v. Am. Tobacco Co., Inc.*, 189 F.R.D. 544, 550-51 (D. Minn. 1999) (denying class certification in part because named class action plaintiffs were inadequate representatives where they jeopardized class members' ability to bring personal injury claims in a later suit by "splitting off" potential personal injury claims); *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198, 203-04 (W.D. Tex. 2004) (refusing to certify a class on adequacy of representation grounds because any property and personal injury claims arose from the same transaction and because waiver of personal injury claims could result in such claims being barred by *res judicata* in the future); *In re Methyl Tertiary Butyl Ether ("MTBE") Prods. Liab. Litig.*, 209 F.R.D. 323, 338-40 (S.D.N.Y 2002) (holding that the class representatives were unable to adequately protect the interests of absent class members with personal injury claims).

However, other courts have found just the opposite. *Bentley v. Honeywell Int'l, Inc.*, 223 F.R.D. 471, 484-85 (S.D. Ohio 2004) (holding that "there would seem to be no reason to inquire into any bodily injuries alleged [in a class suit for injunctive relief and property damages, and] . . . *res judicata* would not apply to bar and/or prejudice any personal injury claims that the class members may have"); *Muniz v. Rexnord Corp.*, Civ. No. 04-2405, 2005 WL 1243428, at *4 (N.D. Ill. Feb. 10, 2005) (finding that the plaintiffs were adequate class representatives and that a class action seeking damages for

22

property damage would not bar and/or prejudice any personal injury claims that the class

members may have); *Gates v. Rohm & Haas Co.*, 265 F.R.D. 208, 217-19 (E.D.

Pa. 2010) (finding that the adequacy requirement was met where plaintiffs were not suing

for either present or future injuries, but sought medical monitoring and property damage

claims); *see also Cooper v. Fed. Reserve Bank of Richmond*, 467 U.S. 867, 880 (1984)

(stating that a judgment in a class action is conclusive in a subsequent action on issues

"actually litigated and determined").

Here, the Court concludes that concerns relating to adequacy of representation

with respect to those persons with potential future personal injury claims do not create so

great a risk as to justify denial of class certification.  It is generally accepted that

preclusion of such future claims relates to claims that were actually litigated or "could

have been litigated."  *Hauschildt v. Beckingham*, 686 N.W.2d 829, 840 (Minn. 2004).

Further, for *res judicata* to apply, the estopped party must have had a "full and fair

opportunity to litigate the matter."  *Id.*; *see Brown-Wilbert*, 732 N.W.2d at 222-25.  Here,

those class members with potential *future* claims could not litigate them now on the

grounds that they do not yet exist.  *See Gates*, 265 F.R.D. at 219 ("The entire point of

claim preclusion is to prevent future actions on grounds that *could have been raised* in an

earlier action, not to prevent future actions on grounds that *did not yet exist* (and therefore

could *not* have been raised) in an earlier action.") (emphasis in original).

However, with respect to those class members with present personal injury claims,

the Court's analysis is more complicated.  There is certainly a genuine and serious risk

that *res judicata* and claim-splitting bars would apply to members who do not litigate

personal injury claims now.  *See Thompson*, 189 F.R.D. at 550-51 ("[T]he named

Plaintiffs' efforts to reserve personal injury and damage claims may, in fact, jeopardize

the class members' rights to bring such claims in a subsequent case.").  However, based

on the fact that Plaintiffs have represented to the Court that there is no class member with

*present* personal injury claims, the Court concludes that Plaintiffs can be adequate

representatives at this time.  *See Gates*, 265 F.R.D. at 219 (concluding that for possible

present injuries, the risks of claim-splitting were not fatal to certification in part because

they did not appear to exist at the time of certification).  Further, the Court can always

modify or decertify the class should it become necessary in the future. [6]  Thus, the Court

concludes that the adequacy requirements have been met and that a class action is still the

best mechanism for proceeding with this case.

### C.    Ascertainability

An implicit requirement of class certification is that the "class, as proposed, is

objectively ascertainable."  *Brown v. Wells Fargo & Co.*, 284 F.R.D. 432, 444 (D.

Minn. 2012).  "At a minimum, the description must be 'sufficiently definite that it is

administratively feasible for the court to determine whether a particular individual is a

member."  *ConocoPhillips,* 298 F.R.D. at 581 (citation omitted).

---

[6]    The Court can further protect the rights of class members with personal injuries, if any, by the following:  ensuring the class definition explicitly excludes individuals who have a physical injury as a result of Defendant's conduct; ordering that Plaintiffs reserve the right to maintain later actions for personal injuries; narrowing issues addressed by this class action to liability and injunctive relief only; and the creation of subclasses where appropriate.

Plaintiffs seek to define the proposed class based on specified geographical boundaries. Defendant objects, arguing that the boundaries as proposed fail to take into account upgradient sources of TCE, and Defendant further argues that the Court cannot determine who is and is not in the putative class based on this definition because the class can only be determined at the conclusion of the proceedings.

The Court concludes that the proposed class is sufficiently ascertainable. The issues flagged by Defendant are issues to be determined after the class is certified. First, the questions of whether upgradient sources contributed to the presence of TCE, and in what amount, do not impact class certification. Plaintiffs present sufficient preliminary evidence that GMI was at least a cause of the TCE groundwater plume as identified, if not a substantial cause.

Second, contrary to Defendant's arguments, a geographical boundary-delineated class does in fact allow the Court to identify the members of the putative class. Plaintiffs present preliminary evidence in the form of expert testimony and a number of other documents reflecting the basis for the proposed geographic boundaries. The boundaries create a list of specific and identifiable potential class members. Thus, Defendant's concerns really relate to how many class members have valid claims and not the class's ascertainability; the number of class members with valid claims is an issue to be determined after the class is certified. *See, e.g.*, *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) ("To require the district judge to determine whether each of the 150 members of the class has sustained an injury . . . would make the class certification process unworkable; the process would require, in this case, 150 trials before the class

could be certified.  The defendants are thus asking us to put the cart before the horse.

How many (if any) of the class members have a valid claim is the issue to be determined

*after* the class is certified.) (emphasis in original).[7]  Thus, the Court concludes that the

class is ascertainable.

### D.    Rule 23(b) Requirements

#### 1.    Rule 23(b)(1)

Plaintiffs appear to claim that the class can be certified under any and all of the

Rule 23(b) mechanisms.  Under Rule 23(b)(1)(A), a class may be certified if "prosecuting

separate actions by or against individual class members would create a risk of . . .

inconsistent or varying adjudications with respect to individual class members that would

establish incompatible standards of conduct for the party opposing the class."  Fed. R.

Civ. P. 23(b)(1)(A).  This means that the court must find that individual lawsuits would

create the possibility of establishing "incompatible standards of conduct" for GMI.  *See*

*Brown v. Wells Fargo & Co.*, 284 F.R.D. at 446 (citing *Reynolds v. Nat'l Football*

*League*, 584 F.2d 280, 283 (8th Cir. 1978)).

Here, there is no such risk.  Even if each class member brought separate lawsuits

and different injunctive relief was ordered in each case, GMI would be able to implement

different relief for each plaintiff without issue.  Further, the class members are seeking

the same injunctive relief—full remediation, which shows that there is no risk of

inconsistent adjudication.  *See, e.g.*, *Baer v. G&T Trucking Co.*, Civ. No. 03-3460, 2005

---

[7]      While the Court finds the class generally ascertainable, the Court also notes that
Plaintiffs will have to limit the class to a specific time frame with respect to ownership.

WL 563107, at *4 (D. Minn. Mar. 1, 2005) (citations omitted) (declining to certify under

Rule 23(b)(1) for a proposed class of truck operators alleging discrimination and seeking

the same relief).  Similarly, individual adjudication would not, as a practical matter, "be

dispositive of the interests of the other members not parties to the individual

adjudications or . . . substantially impair or impede their ability to protect their interests"

under Rule 23(b)(1)(B).  Therefore, Rule 23(b)(1) certification is inappropriate and the

Court declines to certify the class under Rule 23(b)(1).

## 2.    Rule 23(b)(2)

For certification under Rule 23(b)(2), a defendant must have "acted or refused to

act on grounds that apply generally to the class, so that final injunctive relief or

corresponding declaratory relief is appropriate respecting the class as a whole[.]"  Fed. R.

Civ. P. 23(b)(2).  Class claims under Rule 23(b)(2) must be cohesive.  *In re St. Jude*

*Med., Inc.*, 425 F.3d 1116, 1121 (8th Cir. 2005).  Cohesiveness is particularly important

for a Rule 23(b)(2) class because, "unlike Rule 23(b)(3), there is no provision for

unnamed class members to opt out of the litigation."  *Avritt v. Reliastar Life Ins. Co.*, 615

F.3d 1023, 1035 (8th Cir. 2010) (citing *In re St. Jude*, 425 F.3d at 1121).

Defendant argues that class certification under Rule 23(b)(2) is inappropriate

because GMI cannot do anything to benefit the entire putative class.  Specifically, GMI

asserts that because it has already installed VMSs, any additional relief would be highly

individualized.  GMI further contends that the TCE levels will need to be determined for

each property and will need to be customized for each home and its inhabitants.  The

Court disagrees and concludes that certification under Rule 23(b)(2) is appropriate in this case.

First, certification under Rule 23(b)(2) is appropriate because Plaintiffs seek primarily declaratory or injunctive relief. *Avritt*, 615 F.3d at 1035 (citing *In re St. Jude*, 425 F.3d at 1121) ("Class certification under Rule 23(b)(2) is proper only when the primary relief sought is declaratory or injunctive."). Here, Plaintiffs seek the following relief, which is primarily declaratory or injunctive: (1) a determination that GMI is liable to owners of the properties in the defined Class Area; and (2) relief in the form of comprehensive remediation.

Second, whether or not Plaintiffs will be granted the relief they seek is different from whether the relief they seek will impact all the class as a whole—the appropriate question for Rule 23(b)(2) certification; Defendant's concerns are also premature. *See, e.g.*, *Bentley*, 223 F.R.D. at 486 (noting that defendants were making premature merits arguments with respect to Rule 23(b)(2)). Plaintiffs seek a declaration as to liability. Plaintiffs also seek relief such as the full remediation of the groundwater to appropriate levels, class-wide VMSs, and other area-wide remedial efforts. If, for example, ordered relief includes class-wide VMSs, the fact that some homes already have VMSs does not change the effect of a determination that all homes in the class area must have them—a determination that impacts the class as a whole. *See ConocoPhillips*, 298 F.R.D. at 585 (citation omitted) ("It is sufficient under Rule 23(b)(2) if class members complain of a pattern or practice that is generally applicable to the class as a whole. Even if some class members have not been injured by the challenged practice, a class may nevertheless be

appropriate."); *see also DeBoer*, 64 F.3d at 1173-75 (granting certification under Rule 23(b)(2) where the defendant's liability to the class turned on the resolution of a single question that applied to uniformly to the entire class). Thus, the Court concludes that certification under Rule 23(b)(2) is appropriate in this case.[8]

### 3.     Rule 23(b)(3) Requirements

Under Rule 23(b)(3), a court must find that "questions of law or fact common to class members predominate over any questions affecting only individual members" in order to certify a class. Fed. R. Civ. P. 23(b)(3). When considering the facts of a given case, "a claim will meet the predominance requirement when generalized evidence proves or disproves the elements of the claim on a class-wide basis, because such proof obviates the need to examine each class member's individual position." *Buetow v. A.L.S. Enters., Inc.*, 259 F.R.D. 187, 190 (D. Minn. 2009) (citation and quotations omitted).

Rule 23(b)(3) further requires the court to find that "a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The rule provides four nonexclusive factors regarding superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

*Id.*

---

[8]     The Court agrees with Defendants that certification of monetary relief claims under Rule 23(b)(2) is improper under *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2557 (2011). Thus, the Court addresses its hybrid certification approach below.

Defendant argues that neither the predominance nor the superiority requirement have been met in this case because individual liability-related issues overwhelm any common issues.  Defendant points to an extensive list of allegedly "individual issues" that bear on contamination.  (*See* Doc. No. 117 at 35.)  For example, Defendant argues whether and to what extent the groundwater beneath any given property is contaminated is individualized.  The Court disagrees.

As Plaintiffs argue, the key issues of fact and law proposed for class treatment can be addressed through common proof.[9]  Although there are a number of individualized issues, they do not predominate over the common issues for those questions for which certification is sought.  Defendant's liability here is based on its actions relating to its release of certain chemicals at a single source, into a geographically limited area, in the Como neighborhood in Minneapolis, and in the form of a single plume.  *See, e.g.*, *Bentley*, 223 F.R.D. at 475, 486-87; *cf. MTBE Prods. Liab. Litig.*, 209 F.R.D. at 350 (finding that certification was inappropriate in part because there was *no single incident*, but rather contamination via pipelines that occurred over *many years* and *across four states*, and *involving many defendants* and third parties) (emphasis added); *cf. also Henke v. Arco Midcon,* LLC, Civ. No. 10-86, 2014 WL 982777, at *15-16 (E.D. Mo. Mar. 12, 2014) (same with respect to contamination over "hundreds of different properties in five counties, spanning over a hundred miles").  The GMI site is alleged to be at least the substantially dominant source of contamination in the area.  The questions to be certified

---

[9]     Although Plaintiffs fail to even address Rule 23(b)(3) certification in their reply brief, they indicate their intent to seek certification under Rule 23(b)(3) in their opening brief in support of class certification.

focus on whether Defendant caused contamination of the area surrounding a single dump

site, whether its actions violated the law, and thus whether Defendant is liable for

contamination.  *See, e.g.*, *Canata v. Forest Preserve Dist. of Du Page Cnty.*, Civ.

No. 06-2196 (N.D. Ill. Oct. 11, 2006) ("the common issues concerning property damage

resulting from the disposition of hazardous substances into the environment will

predominate these proceedings").  Plaintiffs point to a number of pieces of evidence in

support of their contentions.  For example, Plaintiffs refer to Defendant's past letters and

past remediation, state and federal determinations, and expert analysis on the subject of

Defendant's contamination.  Moreover, the existence of certain individualized issues,

particularly with respect to damages, does not necessarily preclude certification.  *See*

*Gates*, 265 F.R.D. at 233; *see also Buetow*, 259 F.R.D. at 192 ("The fact that damages

will need to be assessed on an individualized basis does not, in and of itself, require the

denial of a class certification motion.").  The individualized issues must predominate over

the common ones, and they do not here.  Thus, the predominance requirement has been

met.[10]

        Additionally, in light of the relevant considerations, the Court also concludes that

a class action is the superior method for adjudicating these claims.  There are no class

members with separate litigation on these issues.  Also, manageability for the narrow

---

[10]      Defendant further contends that Plaintiffs' reliance on *Mejdrech*, 319 F.3d 910
(7th Cir. 2003), is misplaced.  Defendant asserts that *Mejdrech* required the following for
certification to be appropriate:  (1) a single source of contamination; and (2) drinking
water contamination.  However, contrary to Defendant's arguments, that class was not
only certified on those two narrow requirements.  *See id.*  And, of course, *Mejdrech* is not
controlling here.

issues certified is not a concern.  Thus, the Court concludes that certification under

Rule 23(b)(3) is appropriate in this case.  However, in light of the Court's decision below

with respect to hybrid certification, the Court anticipates that certification under

Rule 23(b)(3) will have to be further addressed later in the proceedings.

### E.      Hybrid Certification

The Court further concludes that hybrid certification is suited to this case.  A

hybrid class action bifurcates the action into two phases:  the first phase addresses the

issue of liability under Rule 23(b)(2); and the second phase addresses the damages issue

under the procedure for Rule 23(b)(3) once liability is determined to exist.  *See, e.g.*,

*Beckmann v. CBS, Inc.*, 192 F.R.D. 608, 615 (D. Minn. 2000); *see also Mathers v.*

*Northshore Mining Co.*, 217 F.R.D. 474, 487 (D. Minn. 2003); NEWBERG ON CLASS

ACTIONS, VOL. 2 at § 4:38  (5th ed. 2012) (describing "hybrid class actions" as used by

courts when plaintiffs seek both injunctive relief and monetary damages).

### F.      Article III Standing and Seventh Amendment

According to Defendant, if the Court certifies this class, certification will be

contrary to Article III and Seventh Amendment principles.  First, Defendant asserts that

in the Eighth Circuit, each class member must have standing under Article III.  Defendant

contends that, here, members of the putative class lack standing because they have not

suffered any injury.  According to Defendant, mere contamination beneath the home is

not an injury in and of itself.  The Court disagrees.

Indeed, Plaintiffs must demonstrate that they have suffered an injury in fact in

order to have standing, and that standing is equally required for class actions.  *Avritt*, 615

F.3d at 1034. And, "a class cannot be certified if it contains members who lack standing." *Id.* (citation and quotation omitted). However, "courts do not require that each member of a class submit evidence of personal standing." *Id.* Instead, the class must be defined in such a way that members in it would have standing. *Id.* Plaintiffs here allege that all houses in the Class Area are contaminated and that all members have been injured by that contamination. Plaintiffs present evidence that TCE is a carcinogen and that the entire area will need to be remediated. This is sufficient to show standing, and anything more is a merits issue to be determined by the jury.

Second, Defendant argues that a Court cannot reexamine any fact issues already determined by a jury under the Seventh Amendment. Defendant contends that if the Court bifurcates certain issues, particularly as they relate to individual properties, it will be requiring violation of this Seventh Amendment principle. Defendant cites *In re Rhone-Poulenc Rorer, Inc.*, 51 F.3d 1293 (7th Cir. 1995), which held that because a first jury would not determine liability, bifurcation would result in reexamination of that jury's findings to make a final determination as to all issues pending against defendants.

Here, however, as currently proposed, all issues of liability would be addressed in the primary trial, and only potentially individualized damages issues would be determined in the second phase of proceedings. Thus, there would be no violation of Seventh Amendment principles with the current bifurcated structure.

## CONCLUSION

The Court concludes that a class action is appropriate in this case based on its broad discretion and therefore certifies the class as proposed.  Defendant's motions relating to Dr. Everett and Dr. Ozonoff are denied at this stage in the proceedings.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiffs Amended Motion to Certify Class (Doc. No. [93]) is **GRANTED** and the class as proposed is certified, subject to the explicit identification of the beginning and ending dates of liability.

2.      The class definition must explicitly exclude individuals who have a physical injury as a result of Defendant's conduct.  Plaintiffs reserve the right to maintain later actions for personal injuries.

3.      Future individual claims by class members for bodily injury or medical monitoring are not precluded if they could not have been brought at this time.

4.      Defendant General Mills, Inc.'s Motion to Exclude Expert Testimony and Opinions of Dr. David Ozonoff (Doc. No. [119]) is **GRANTED IN PART and DENIED IN PART** as follows:

   a.      The Court declines to exclude Dr. Ozonoff's opinions relating to environmental contamination in the proposed Class Area and the public health risk to the population in the proposed Class Area, but does exclude Dr. Ozonoff's opinions relating to the real estate market.

34

     5.       Defendant General Mills, Inc.'s Motion to Exclude Expert Testimony and

Opinions of Dr. Lorne G. Everett (Doc. No. [124]) is **DENIED**.

Dated:  February 27, 2015          s/Donovan W. Frank
                                        DONOVAN W. FRANK
                                        United States District Judge